UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESTATE OF CHARLES HOLLSTEIN, | )<br>) |
| Plaintiff, | ) No. 17 C 00112<br>) |
| v. | )<br>) Judge Edmond E. Chang |
| CITY OF ZION,<br>STEVEN VINES,<br>and NATHAN HUCKER, | )<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In January 2016, Steven Vines and Nathan Hucker, police officers for the City of Zion, stopped Charles Hollstein on the street to question him. But this encounter ended in death: Vines fatally shot Hollstein. Hollstein's Estate filed this civil-rights lawsuit under 42 U.S.C. § 1983, claiming that the officers used unreasonable force in violation of the Fourth Amendment (as incorporated against local officers through the Fourteenth Amendment's due process clause).[1] R. 26, First Am. Compl.[2] The Estate also brought state-law claims under the Illinois Survival Act, the Illinois Wrongful Death Act, common law battery, and a claim for funeral expenses, as well as respondeat superior and indemnification claims against the City of Zion.[3] The

---

[1]The Court has jurisdiction over the Estate's § 1983 claim under 28 U.S.C. § 1331, and supplemental jurisdiction applies to the state-law claims under 28 U.S.C. § 1367.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

[3]Initially, Hollstein also brought a claim against the City of Zion under a *Monell* liability theory. *See* R. 26, First Am. Compl. ¶¶ 22-43. That claim was voluntarily dismissed in October 2017. R. 16.

Defendants move for summary judgment, arguing that the officers' use of force was reasonable (or at least protected by qualified immunity), and that their conduct was not willful and wanton. R. 60, Defs.' Mot. Summ. J.; R. 61, Defs.' Summ. J. Br. For the reasons explained below, summary judgment is granted on the federal claim, and supplemental jurisdiction is relinquished on the state-law claims.

## I. Background

In deciding the Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to the Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On January 6, 2016, police officers Steven Vines and Nathan Hucker both (in their separate squad cars) "received a call from their dispatch service that a suspicious person was taking pictures outside of an elementary school." R. 67, Pl.'s Resp. DSOF ¶¶ 7-8. They drove (in their separate cars) to the school and spoke to a man nearby, who claimed to be the 911 caller. *Id.* ¶¶ 10-11. The tipster reported that the man taking photos had walked away and pointed out the direction in which the man had walked; Hucker drove his squad car in that direction. *Id.* ¶ 12.

A few blocks from the school, Hucker encountered Charles Hollstein, who "fit the description" the tipster had given. Pl.'s Resp. DSOF ¶ 13. Vines drove to where Hucker and Hollstein were. *Id.* Hucker asked Hollstein why he had been outside of the school, and Hollstein answered that he was taking pictures of the school for a newspaper in Waukegan (a nearby city). *Id.* ¶ 15. Hucker and Hollstein had a disagreement about whether, at the time Hollstein was taking photos of the school,

2

there were people in the school. *Id*. ¶¶ 15-16, R. 62-5, Defs.' Exh. E, Dashcam Video at 8:21:10-8:21:55. Then, Hucker asked Hollstein for his identification. Pl.'s Resp. DSOF ¶ 17. Hollstein objected, and Hucker and Hollstein argued about whether the request for identification was legal or appropriate. Pl.'s Resp. DSOF ¶¶ 16-19; Defs.' Exh. E, Dashcam Video at 8:22:44-8:24:00; *see also* R. 72, Defs.' Resp. PSOF ¶¶ 5-7. Hollstein ultimately refused to provide any identification. Pl.'s Resp. DSOF ¶ 19; Defs.' Exh. E, Dashcam Video at 8:24:00.

When the officers attempted to arrest Hollstein, he "broke away" and "sprinted down the street and turned into an alley." Pl.'s Resp. DSOF ¶ 20; R. 62-2, Defs.' Exh. B, Hucker Dep. Tr. at 44:1-10. Hucker and Vines ran after him, and Hucker shot his taser at Hollstein. Pl.'s Resp. DSOF ¶¶ 20-21; Hucker Dep. Tr. at 44:8-45:1. The Defendants claim that the taser "did not do anything to Hollstein." Pl.'s Resp. DSOF ¶ 21; *see also* Hucker Dep. Tr. at 45:2-7. The Estate disputes that characterization, but at the very least the taser did not totally debilitate Hollstein. *Id*. Eventually the officers caught up to Hollstein and began fighting with him. Pl.'s Resp. DSOF ¶ 22. Hucker and Vines both maintain that as Hucker grappled with Hollstein, Vines "shot his taser into Hollstein's leg." *Id*. Again, the officers say that this second taser shot "had no effect" and that Hollstein "ripped out the taser cords and continued to fight [them]." The taser's ineffectiveness led Vines to believe that Hollstein might be wearing body armor. Pl.'s Resp. DSOF ¶ 14; Vines Dep. Tr. at 87:7-89:7. *Id*.; *see also* Hucker Dep. Tr. at 46:4-18; R. 62-1, Defs.' Exh. A, Vines Dep. Tr. at 15:3-16:11. After the second taser shot, "Hucker managed to get Hollstein in a headlock, and Vines

3

pepper-sprayed" him in the face. Pl.'s Resp. DSOF ¶ 23; Vines Dep. Tr. at 53:16-21. Despite the pepper spray, Hollstein "continued to fight." Pl.'s Resp. DSOF ¶ 23; *see also* Vines Dep. Tr. at 54:6-21.

At that point, the officers say that Hollstein tried to get control of Hucker's gun. According to the officers, Hucker screamed, "He's going for my gun!" Pl.'s Resp. DSOF ¶ 24; Vines Dep. Tr. at 54:6-10. One of the squad car's video cameras, Defendants' Exhibit E beginning at 8:24:30, captures those words on audio, or something very close to those words (at this time, Hollstein and the officers were no longer in the camera's view, but the camera continued to record audio of the interaction). Vines then noticed that Hollstein's fingers were on Hucker's gun, which was still in its holster. Pl.'s Resp. DSOF ¶ 27; Vines Dep. Tr. at 54:11-55:6. Vines put his hand on top of Hollstein's, to try to prevent him from taking the gun out of the holster. Pl.'s Resp. DSOF ¶ 27. According to the officers, Hollstein was trying to press the "thumb break" to remove the hood from the gun, a necessary step to taking it out of the holster. Pl.'s Resp. DSOF ¶ 28; Vines Dep. Tr. at 54:22-55:6; *see also* Defs.' Resp. PSOF ¶ 11; R. 67-1, Pl.'s Exh. 1, Vines Dep. Video Excerpt (Vines demonstrating the thumb break on his firearm). The Estate agrees that Hollstein's hand was on the gun, that Hucker's hand was also partly on top of Hollstein's and at least partly on the thumb break, and that Vines put his hand on top of Hollstein's. Defs.' Resp. PSOF ¶¶ 11-15. But the Estate disputes that Hollstein was attempting to remove the gun from the holster. *Id*.; Pl.'s Resp. DSOF ¶ 28. Whether or not

4

Hollstein was trying to operate the thumb break, it is undisputed that he never managed to get the gun free from the holster. Defs.' Resp. PSOF ¶¶ 16-17.

At some point—either before or after Hollstein reached for the gun—Hollstein and the officers all fell to the ground. Pl.'s Resp. DSOF ¶ 25; Defs.' Resp. PSOF ¶ 19; Vines Dep. Tr. at 83:6-85:4. While they were all on the ground, and while Hollstein's hand was on top of Hucker's gun holster—and after Hucker yelled that Hollstein was trying to get his gun—Vines fired three shots into Hollstein's torso. Pl.'s Resp. DSOF ¶ 29; Vines Dep. Tr. at 54:22-55:6; *see also* Defs.' Resp. PSOF ¶ 17-19. Those shots killed him. *See* Defs.' Resp. PSOF ¶ 17.

## II. Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[4] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

5

presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Excessive Force

A police officer's use of force to effect an arrest is a seizure under the Fourth Amendment, and to be lawful, it must be reasonable. *Horton v. Pobjecky*, 883 F.3d 941, 948-49 (7th Cir. 2018). Use of deadly force is reasonable "when an officer [objectively] believes that a suspect's actions place[] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (emphasis omitted); *see Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape."). The reasonableness standard is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

6

motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). When evaluating reasonableness, courts must consider the totality of the circumstances. *Id.*

Even where a police officer's use of force is objectively unreasonable, however, the officer may still avoid liability under the doctrine of qualified immunity. Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (cleaned up). A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that [the official's actions would] violate[] that right." *Reichle*, 566 U.S. at 664 (cleaned up). To identify a clearly established right, courts "do not require a case directly on point." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). Rather, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741). The analysis asks whether the *specific* conduct at issue violates clearly established law, and courts must not define prior law at "a high level of generality." *Id.* (quoting *al–Kidd*, 563 U.S. at 742).

Here, the undisputed facts compel the conclusion that Vines and Hucker are entitled to qualified immunity. To be sure, the Plaintiff denies parts of the officers' stories. For example, the Estate disputes that Hollstein ran from the officers, Pl.'s Resp. DSOF ¶ 20; that Hucker's initial taser shot failed to have any effect on him, *id.* ¶ 21; that he "wrestled with and bit Hucker's arm," *id.* ¶ 22; that the second taser

7

shot had no effect, *id.*; that he continued to fight with the officers after Vines pepper-sprayed him, *id.* ¶ 23; that Hucker yelled, "He's going for my gun!", *id.* ¶ 24; and that he might have been able to grab Hucker's gun from his holster, *id.* ¶¶ 27-29.[5] But the Estate has not offered any evidence of its own that calls into question the officers' assertions. The Estate cites cases to suggest that because Hollstein is unable to testify himself, the Court should consider the defense evidence skeptically. R. 66, Pl.'s Resp. Br. at 3-4 (citing *Childs v. City of Chi.*, 2017 WL 1151049, at *4 (N.D. Ill. Mar. 28, 2017); *Estate of DiPiazza v. City of Madison*, 2017 WL 1337313, at *10 (W.D. Wis. Apr. 11, 2017)). But it is still up to the Plaintiff to provide admissible evidence that brings the defense's facts into dispute. *See Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (affirming summary judgment for officers where the plaintiffs "dispute[d] the officers' characterization of the events, but [offered] no real evidence to contract it."); *Muhammed v. City of Chi.*, 316 F.3d 680, 638-84 (7th Cir. 2002) ("Muhammed finally argues that summary judgment was not appropriate because a jury could choose to disbelieve [the defendant's] account of the shooting. To prevent summary judgment, Muhammed needed to provide specific evidence when attacking [the defendant's] credibility.").

The only other evidence available in this case—besides the officers' accounts—are the video recordings taken from Vines's taser, R. 62-4, Defs.' Exh. D, Taser Video, and Hucker's squad car's dashboard camera, Defs.' Exh. E, Dashcam Video. But

---

[5]The paragraph numbers in Plaintiff's Response to the Defendants' Statement of Material Facts are all one number less than the corresponding paragraphs in the defense Statement, because Paragraph 1 of the defense Statement is actually just a list of exhibits, rather than an actual asserted fact.

8

neither video contradicts the officers' accounts, either directly or via an inference from the circumstances. The altercation takes place out of view of the dashboard camera, and the taser video is too close-up and brief to provide a solid understanding of what the parties' interactions were like. If anything, the audio accompanying the dashcam footage *supports* the officers' accounts. *See* Defs.' Exh. E, Dashcam Video at 8:24:30 (voice yelling what sounds like, "He's going for my gun."). So even viewing the facts in the light most favorable to the Estate, it has failed to bring the officers' accounts into dispute.

With those facts as established, qualified immunity applies because the Plaintiff has not offered any analogous case that deems the officers' conduct as unreasonable "beyond debate." *Mullenix*, 136 S. Ct. at 308. The Estate argues that the right at issue is well established: "a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." Pl.'s Resp. Br. at 10 (quoting *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 484 (7th Cir. 2015). But that defines the right at issue at too "high [a] level of generality." *al–Kidd*, 563 U.S. at 742. Instead, the Plaintiff must point to law clearly establishing that the officers' *specific conduct* here violated his rights. *Id*.

The Estate critiques the cases cited by Vines and Hucker, arguing that they are distinguishable from the facts here. Pl.'s Resp. Br. at 11 (arguing that "[Defendants'] argument rests on the false factual premise that Charles Hollstein was imminently able to get control of and use Hucker's gun," and that a jury could find

9

Hollstein would not have been able to use Hucker's gun under the facts of this case); *see also id.* at 9-10 (distinguishing *Henning*, 477 F.3d at 494-95; and *Tom v. Voida*, 963 F.2d 952, 954-55 (7th Cir. 1992)). But of course that is not the point—Vines and Hucker are not required to point out cases that exactly match this one to establish that there was *no* constitutional violation, just as the Estate need not offer an exact match. *See* Defs.' Summ. J. Br. at 9 ("*Henning* and *Tom* state … that it is not a constitutional violation for an officer to use deadly force when a suspect is going for an officer's gun and has the imminent ability to actually get control of it."). The cases that the officers have identified, which are similar but not identical to the facts of this case, suggest if anything that Vines's use of force was reasonable. *See id.* (citing *Henning*, 477 F.3d at 495 (police shooting case finding no Fourth Amendment violation when one of the officer's guns had fallen out of his holster and was on the ground with the victim's hand on it); *Tom*, 963 F.2d at 954-55 (police shooting case finding no Fourth Amendment violation in which the victim and officer had a physical fight, and the officer feared the victim would grab her gun). The Estate has not pointed to a closer case that comes out the other way—and it does not appear that there is one.

That makes sense. Here, by the time that Vines shot Hollstein, Vines and Hucker had each attempted to taser him, Vines had pepper-sprayed him, and yet he was still resisting. More importantly, at that point, Hollstein's hand was on Hucker's gun holster and the officers reasonably believed that Hollstein was trying to get a hold of the gun. So a reasonable officer would have probable cause to believe that

10

Vines and Hucker were "in imminent danger of death or serious bodily injury." *Sherrod*, 856 F.2d at 805. And it would have been reasonable for the officers to believe there was nothing else they could do to protect themselves in that situation. Vines testified that the officers believed that Hollstein was wearing body armor, Pl.'s Resp. DSOF ¶ 14; Vines Dep. Tr. at 87:7-89:7, and Hollstein's resistance to the two taser shots renders that belief reasonable. Under these circumstances, at the very least, qualified immunity protects the officers from liability.

The Estate argues that Vines's and Hucker's hands were on top of Hollstein's—preventing him from actually getting to Hucker's gun. Pl.'s Resp. Br. at 5 ("Hollstein did not have possession of the gun and very likely could not have gained possession of the gun."); *id.* at 11 ("[A] jury could certainly determine that Charles was unable to get possession of [] Hucker's gun imminently or otherwise."); Defs.' Resp. PSOF ¶¶ 11-15. But this argument does not work. Just because the officers might have been winning their fight with Hollstein when Vines fired the shots does not mean that the officers could not have reasonably believed that they were in imminent danger. To be sure, in the same situation, some officers might have waited longer before firing or tried other ways to subdue Hollstein. But as the Seventh Circuit put it in *Henning*, "[p]olice officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety." 477 F.3d at 496.

On the importance of Hollstein trying to operate the thumb break, the Estate maintains that Hollstein did not know how the thumb break worked, while Vines

testified (at his deposition) that he believed Hollstein was trying to operate it. *See* Pl.'s Resp. DSOF ¶¶ 28-29; Vines Dep. Tr. at 54:22-55:11 ("I saw [Hollstein] start to manipulate the thumb break on the holster."). It is true that, as noted earlier, circumstantial evidence sometimes is enough for a reasonable jury to reject an otherwise one-sided account. On the thumb-break issue, however, a thumb break is just a strap that holds the gun in a holster. *See* Pl.'s Resp. DSOF ¶ 28 (not disputing the description of a thumb break). There is nothing particularly complicated about a thumb break that would allow a reasonable jury to disbelieve Vines's assertion that Hollstein was trying to operate it—or, at the very least, that a reasonable officer would believe that Hollstein was trying to remove the gun from the holster. Under these circumstances, again it is *not* clearly established that a reasonable officer lacked probable cause to believe that the officer's life was in imminent danger. So qualified immunity applies.

Moving beyond the details of the hand-to-hand struggle itself, the Estate more broadly argues that the officers were the first to escalate the situation by unreasonably asking Hollstein for his identification and attempting to arrest him in the first place. Pl.'s Resp. Br. at 2 ("The Defendant officers were unjustifiably and immediately aggressive with Charles, needlessly escalating the encounter. They violently initiated an arrest for which they had no probable cause.") (internal citations omitted); *id*. at 7 ("The lack of probable cause for the initial seizure is important in evaluating the totality of the circumstances resulting in the Defendants' use of deadly force against Charles."). The Plaintiff argues that Illinois law does not

12

prohibit arguing with or refusing to provide identification to a police officer. *Id.* at 7-8. In the Estate's view, the lack of probable cause for an arrest should "inform the fact-finders' ultimate determination of the objective reasonableness of the use of force." *Id.* at 7.

Hucker and Vines counter that whether they had probable cause to arrest Hollstein initially is irrelevant. R. 71, Defs.' Reply Br. at 6; (citing *City and Cty. of S.F., Calif. v. Sheehan*, 135 S. Ct. 1765, 1776-78 (2015) (reversing a decision that officers who entered the home of an "armed, mentally ill suspect who had been acting irrationally" were not entitled to qualified immunity simply because they could have avoided the situation) (internal quotation omitted); *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009) ("Pre-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; we limit our analysis to force used when a seizure occurs.")).[6] The Defendants are right in a *limited* sense: whether the officers initially had probable cause to arrest Hollstein is not *dispositive* of whether Vines later used force that was excessive. In *County of Los Angeles, California v. Mendez*, the Supreme Court rejected the Ninth Circuit's "provocation rule." 137 S. Ct. 1539, 1543-44 (2017) (holding that "[i]f law enforcement officers make a 'seizure' of a person using force that is judged to be reasonable .. [they may not] nevertheless be held liable for injuries caused by the seizure on the ground that they committed a separate Fourth Amendment violation that contributed to their need to use force."). *Mendez*

---

[6]The officers also argue in the alternative that they *did* have probable cause to arrest Hollstein. Defs.' Reply Br. at 6. The Court need not consider that argument in light of the holding, as explained above.

13

held that, so long as an officer's use of force was reasonable at the time of the seizure, the officer's *pre*-seizure violation of the Fourth Amendment cannot be the basis for liability for the seizure itself. *Id.* But the opinion left open two other inquiries in which an officer's pre-seizure conduct might still be relevant.

First, if an earlier violation of the Fourth Amendment was the proximate cause of the harm arising from the use of force applied at the time of the seizure, then the victim could recover (subject to qualified immunity) damages that are proximately caused by the earlier Fourth Amendment violation. *Mendez*, 137 S. Ct. at 1548-49 (directing the Ninth Circuit to consider this issue on remand: "[T]he court should revisit the question whether proximate cause permits respondents to recover damages for their shooting injuries based on the deputies' failure to secure a warrant at the outset."). But here, the Estate has not argued that the officers' allegedly improper initial stop or attempt at the arrest *proximately caused* Hollstein's death. The argument does not show up in the Plaintiff's summary judgment briefing, nor does the First Amended Complaint describe the officers' initial attempt to arrest Hollstein as a cause of the fatal shooting. First Am. Compl. ¶¶ 19-21. In any event, the argument would likely have fallen short, because the struggle between Hollstein and the officers—including Hollstein's attempt to reach for Hucker's gun—would almost surely have been deemed an intervening event that broke the chain of proximate cause between the attempted arrest and the firing of the shots. And again, at the very least, qualified immunity would apply in this factual setting.

14

*Mendez* also leaves open the possibility that an initial Fourth Amendment violation could be considered as part of the totality of the circumstances that might render an officer's use of force excessive. *See Mendez*, 137 S. Ct. at 1547 n.2 ("*Graham* commands that an officer's use of force be assessed for reasonableness under the totality of the circumstances. On respondents' view, that means taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it.... [W]e decline to address [that issue] here.") (cleaned up). Perhaps this is the argument the Estate's brief relies on, though the argument is not developed (nor is it clear how different this theory of liability is from the proximate-cause theory). In any event, the officer's initial stop—even if there was no basis for it—did not foreseeably create the need to use excessive force. Nothing about the *way* the officers conducted the flawed stop and arrest would *foreseeably* lead to Hollstein wrestling with the officers and reaching for Hucker's gun.

To illustrate this point, consider a very different example. Imagine that a police officer encounters a man who is crossing a street outside of the marked crosswalk, and jay-walking is a crime. The officer instructs the jay-walker to stop, *and* the officer draws and points his gun right at the jay-walker. In response, the pedestrian tries to grab the officer's gun, which then prompts the officer to shoot the man. It is arguably foreseeable that the pedestrian, reacting to this life-threatening scenario, would try to grab the officer's gun. On those facts, the officer's abrupt, unnecessary, and life-threatening escalation of the encounter would make it much more likely (that is, foreseeable) that the officer's own conduct *before* shooting the pedestrian created the

15

need to use deadly force, even though at the *moment* of the shooting, the pedestrian was grabbing for the officer's gun. Here, the situation is much different: the officers drove up to Hollstein and began questioning him. Nothing they did, even attempting to arrest him on an allegedly mistaken view that Hollstein had to provide identification, would foreseeably create the struggle, Hollstein's attempt to grab the gun, and the ensuing shooting. Qualified immunity must apply here because the officers did not violate clearly established law.

### B. Failure to Intervene

Hollstein argues that Hucker is liable under the Fourth Amendment because he failed to intervene when Vines shot Hollstein. Pl.'s Resp. Br. at 6. To be liable for another officer's excessive force, an officer must have "had a realistic opportunity to intervene and stop the first officer's actions." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Having a realistic opportunity requires "reason to know … that excessive force was being used." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).

Leaving aside the question of whether Hucker had a realistic opportunity to stop Vines from shooting Hollstein (an unlikely proposition, given he was on the ground fighting with Hollstein at the time), and even assuming that Vines *did* use unreasonable force, Hucker had no reason to know that Vines was about to use force that was excessive. For the same reasons that Vines cannot be liable, set out above, Hucker is also protected from liability on a failure-to-intervene theory by qualified immunity. Vines did not violate Hollstein's clearly established right, so neither can

16

Hucker be held liable for failing to stop Vines. At the end of the day, then, the Estate's excessive-force claims against both Vines and Hucker must fail as a matter of law.[7]

### C. State-Law Claims

Now that judgment is granted for the Defendants on Count One, the remaining claims are the state-law survival, wrongful death, funeral expenses, and battery claims. Those claims turn on whether the officers' conduct was "willful and wanton" under the Illinois Tort Immunity Act. 745 ILCS § 10/2-202; *see also Horton*, 883 F.3d at 954. But because the federal claims are dismissed, the usual presumption kicks in: "when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (per curiam) (citing cases). This presumption is expressed in 28 U.S.C. § 1367(c)(3), which provides for the

---

[7] In addition to the excessive-force claims for Vines's gunshot, the First Amended Complaint also claimed that both Vines's and Hucker's use of their tasers against Hollstein also constituted an unreasonable seizure. First Am. Compl. ¶ 20. The officers make two arguments in response. First, they argue that their use of tasers "did not constitute a seizure," because they claim the taser shots had no effect on Hollstein. Defs.' Summ. J. Br. at 4-5 (citing *Abbott v. Sangamon Cty. Ill.*, 705 F.3d 706, 719-20 (7th Cir. 2013) for the proposition that a taser application is a seizure "because it incapacitates the person who receives the electrical jolt it delivers."). Second, the officers also argue that "use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." Defs.' Br. at 5 (quoting *Abbott*, 705 F.3d at 727). Leaving aside whether those arguments could succeed (the undisputed facts establish that Hollstein was running away when Hucker first used his taser, Pl.'s Resp. DSOF ¶¶ 20-21, but that he was actively fighting with Hucker when Vines used his taser, Pl.'s Resp. DSOF ¶ 22), the Estate explicitly abandons this theory of liability in its response brief, *see* Pl.'s Resp. Br. at 4 n.1, which does not argue that either use of the taser was unreasonable.

The Estate abandons the conspiracy claim as well, Pl.'s Resp. Br. at 13 n.2 ("Plaintiff concedes that the evidence developed during discovery does not support a continued claim for conspiracy."), so the Court will also enter judgment for the Defendants on that claim.

discretionary relinquishment of jurisdiction over state claims when the claims providing original jurisdiction have dropped out of the case.

Here, Count One created federal-question jurisdiction, and the Estate has not asserted diversity jurisdiction. There is no good reason to hang onto the state claims: there will be no statute of limitations bar because of Illinois's savings statute, 735 ILCS 5/13-217, and the Court has not spent significant judicial resources on the state claims; nor is it crystal clear how they should be decided. *See Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007). Although the parties *have* spent considerable time on discovery (which overlapped with the federal claims), they will be able to use the fruits of that labor in any future state-court case. Because the federal claims have been dismissed, this Court will also relinquish supplemental jurisdiction over the state-law claims (with the exception of the conspiracy claim (Count Six), which the Estate concedes should be dismissed, *see supra* n. 6).

## IV. Conclusion

The Defendants' motion for summary judgment is granted on the Estate's § 1983 claim (Count One) and the state-law conspiracy claim (Count Six). The Court relinquishes jurisdiction over the remaining state-law claims. Final judgment will be entered.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: April 16, 2019